## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

IN THE MATTER OF THE
EXTRADITION OF

KRZYSZTOF LEBIEDZIŃSKI

No. 20 CR 842

Magistrate Judge Jeffrey T. Gilbert

### MEMORANDUM OPINION AND ORDER

The Government of the Republic of Poland seeks to extradite Krzysztof Lebiedziński ("Lebiedziński"), a citizen of Poland currently residing in the United States, for murder. According to the Polish authorities, Lebiedziński murdered his aunt in their rural hometown of Suraz, Poland during the early morning hours of July 16, 2000. Because Poland has submitted a valid request for extradition under 18 U.S.C. § 3184 and the relevant treaty provisions, this Court must certify Lebiedziński's extradition to the Secretary of State and the Court explains its reasons for doing so in this Memorandum Opinion and Order.

### Analysis

"Authority over the extradition process is shared between the executive and judicial branches," *Santos v. Thomas,* 830 F.3d 987, 991 (9th Cir. 2016) (en banc), and the role of the judiciary is circumspect. The Court may exercise only the limited authority that has been delegated to the judiciary by Congress to decide whether to certify extraditability to the Secretary of State. *DeSilva v. DiLeonardi,* 181 F.3d 865, 867 (7th Cir. 1999); *Austin v. Healey*, 5 F.3d 598, 600 (2d Cir.1993), cert. denied, 510

U.S. 1165 (1994) ("Extradition is primarily a function of the executive branch, and the judiciary has no greater role than that mandated by the Constitution, or granted to the judiciary by Congress."); *see also, In re Extradition of Burt*, 737 F.2d 1477, 1487 (7th Cir. 1984) (courts "must move with the circumspection appropriate when…adjudicating issues inevitably entangled in the conduct of our international relations"). "In extradition, discretionary judgments and matters of political and humanitarian judgment are left to the executive branch." *Noeller v. Wojdylo*, 922 F.3d 797, 802 (7th Cir. 2019). This rule of non-inquiry in extradition cases is "critical to the continued operation of bilateral extradition treaties between the United States and foreign governments, because it prevents extradition courts from engaging in improper judgments about other countries' law enforcement and judicial procedures and 'serves interests of international comity by relegating to political actors the sensitive foreign policy judgments that are often involved in the question of whether to refuse an extradition request." *Venckiene v. United States*, 929 F.3d 843, 849 (7th Cir.), cert. denied, 140 S. Ct. 379 (2019) (quoting *Noeller*, 922 F.3d at 802) (internal quotations omitted).

Therefore, if the Court finds that the conditions specified in 18 U.S.C. § 3184 have been satisfied and the accused is extraditable, the Court "must certify the extradition to the Secretary of State. The court has no discretion." *Venckiene,* 929 F.3d at 849 (citing *Noeller*, 922 F.3d at 803; *Santos v. Thomas,* 830 F.3d 987, 992 (9th Cir. 2016) (en banc)). Pursuant to 18 U.S.C. § 3184, a request for extradition will be granted if the following findings are made: (1) the judicial officer has jurisdiction to

conduct an extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the person before the Court is the fugitive named in the request for extradition; (4) there is an extradition treaty in full force and effect; (5) the crimes for which surrender is requested are covered by that treaty; and (6) there is competent legal evidence to support the finding of probable cause as to each charge for which extradition is sought. *In re Extradition of Jarosz,* 800 F. Supp. 2d 935, 940 (N.D. Ill. 2011); *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925). Although Lebiedziński challenges only one of the above factors – whether probable cause supports the single charge of murder – the Court must nevertheless conduct the full statutory analysis required by 18 U.S.C. § 3184 before Lebiedziński's extraditability may be certified. [ECF No. 49] at 8 ("Mr. Lebiedziński does not dispute the existence of the initial elements the Government must prove. Mr. Lebiedziński contends, however, that the Government has not satisfied the requirement that probable cause exists.").

## I.    Jurisdiction and Identity

A nation such as Poland with which the United States has an extradition treaty may seek the extradition of a person within the United States by filing a request through the proper diplomatic channels. 18 U.S.C. §§ 3184–3195; *Eain v. Wilkes,* 641 F.2d 504, 508 (7th Cir. 1981). After that request is received, it is forwarded to the U.S. Attorney's Office, which, in turn, plays a predominantly ministerial role and represents the requesting country's interests during the judicial process. [ECF No. 1] at 14 ("In accordance with Article 22 of the Annex, the Government of the United States provides legal representation in the U.S. courts for

3

the Government of Poland in its extradition requests…"). After a complaint is filed and an arrest warrant sought, *Eain*, 641 F.2d at 508, "any justice or judge of the United States, or any magistrate authorized…by a court of the United States, or any judge of a court of record of general jurisdiction of any State" may conduct a hearing and either certify or deny extraditability to the Secretary of State. 18 U.S.C. § 3184.

Here, the Polish government submitted an extradition request to the United States Government on October 15, 2020. On December 3, 2020, the U.S. Attorney's Office for the Northern District of Illinois filed this extradition case against Lebiedziński and obtained an arrest warrant. [ECF No. 1]. The complaint charged Lebiedziński with a single count of murder in violation of Article 148 § 1 of the Polish Criminal Code. [ECF No. 1] at 1–2. Lebiedziński was arrested shortly thereafter, and these extradition proceedings followed.

This Court has jurisdiction to conduct these proceedings, as federal magistrate judges are specifically included among the judicial officers authorized by the extradition statute to consider extradition. 18 U.S.C. § 3184; s*ee also, Matter of Extradition of Simeonov,* 2019 WL 2994521, at *2 (N.D. Ill. 2019). There also is no factual question that Lebiedziński was found and is now in federal custody within the Northern District of Illinois. Nor does Lebiedziński dispute that he is the Krysztof Lebiedziński sought by Poland and identified further by the photograph, fingerprints, and date of birth contained in the extradition request. [ECF No. 1] at 104–109, 169. The Court therefore has personal jurisdiction to determine whether he is subject to

extradition. See 18 U.S.C. § 3184; *In re Extradition of Ortiz,* 444 F. Supp. 2d 876, 882 (N.D. Ill. 2006).

## II.   Relevant Provisions of the Extradition Treaty Between the United States and Poland and the Crime for Which Lebiedziński is Sought

The Court moves next to whether there is an extradition treaty between the United States and Poland in full force and effect. Here, the Government provided an uncontested declaration from an attorney adviser in the Office of the Legal Adviser for the Department of State attesting to the full force and effect of the extradition treaty between the United States and Poland, U.S.-Pol., July 10, 1996, S. TREATY DOC. NO. 105-14 (1997), and the Agreement on Extradition and Annex, U.S.-Pol., June 9, 2006, S. TREATY DOC. NO. 109-14 (2006) (together, "the Extradition Treaty."). [ECF No. 1] at 14, 17–33. Particularly without disagreement by Lebiedziński, this declaration satisfies the Court that the Extradition Treaty is valid. *See Ortiz*, 444 F. Supp. 2d at 882.

So, having established that extradition from the United States to Poland in this case will be governed by the provisions of the federal extradition statute and the Extradition Treaty in full force and effect, the Court now turns to whether the single charge of murder for which Lebiedziński is sought is "punishable under the laws in both Contracting States by deprivation of liberty for a maximum period of more than one year or by a more severe penalty." [ECF No. 1] at 22, Article 2(1). Although Lebiedziński does not challenge this element and has therefore waived any argument to the contrary, the Court's own duty to certify each of condition set forth in 18 U.S.C.

§ 3184 demands a close look at the sentencing structures in both countries. It appears, at least to this Court's satisfaction, that the relevant provisions of Polish, United States, and Illinois law, to the extent it applies, punish murder committed by a fifteen-year-old with a term of imprisonment possibly exceeding a year. [ECF No. 1] at 22, Article 2(1).

The punishment for murder under the Polish Criminal Code is relatively straightforward. The National Prosecutor's Office in Cracow submitted excerpts from the penal code describing the offense of murder and its penalties. [ECF No. 1] at 172–76. Specifically, Lebiedziński is wanted for murder in violation of Article 148, Section 1 of the Polish Criminal Code, which states: "Anyone who kills a person is liable to a penalty of imprisonment for a period not shorter than 8 years, the penalty of 25 years' imprisonment or life imprisonment." [ECF No. 1] at 172. Because Lebiedziński was fifteen years old at the time of the alleged crime, however, Article 10 of the Polish Criminal Code reduces the severity of Lebiedziński's potential sentence. According to Article 10, Section 2, "[a] minor who, after the age of 15, commits a criminal offense specified in…article 148 section 1…may be liable under the terms set out in this code if the circumstances of the case and the degree of development of the perpetrator, his characteristics and personal conditions justify it, in particular, if the previous educational or corrective measures turned out to be ineffective." [ECF No. 1] at 172. Article 10, Section 3 clarifies that for a "case referred to in Section 2, the sentence imposed may not exceed two-thirds of the maximum statutory threat of punishment for the offense attributed to the perpetrator; the court may also apply extraordinary

6

leniency." [1]  [ECF No. 1] at 172. Life imprisonment is not an available sentence for an individual alleged to have committed a crime before the age of eighteen, [ECF No. 1] at 173 (citing Article 54, Section 2), and the statute of limitations for the crime of murder, or homicide, is 30 years from the date of the offense. [ECF No. 1] at 173 (citing Article 101, Section 1). That statute of limitations appears unchanged by the fact that Lebiedziński was fifteen years old, or a minor, at the time of the alleged offense. [ECF No. 1] at 173.

The unjustified killing of another person, or murder, is also punishable by a maximum term of imprisonment of more than one year under both federal and Illinois state law. *See Ortiz,* 444 F. Supp. 2d at 883 ("In assessing the duality of the crimes charged in an extradition proceeding, the Court may refer to either the federal or state law of the United States.") (citing *Cucuzzella v. Keliikoa*, 638 F.2d 105, 107 (9th Cir. 1981)). Federal law criminalizes the "unlawful killing of a human being with malice aforethought" and provides for a penalty of death or imprisonment for life. 18 U.S.C. §§ 1111(a), (b). For a fifteen-year-old charged with murder in violation of 18 U.S.C. § 1111, there is a clear avenue in 18 U.S.C. § 5032 for that individual to be

---

[1] The Circuit Court of Krakow is in accord that Lebiedziński may face a long period of imprisonment (or at least, imprisonment in excess of a year) if he is convicted of the crime of which he is accused. At some point after these extradition proceedings commenced, Lebiedziński retained counsel in Poland to represent his interests in the criminal proceedings that are now underway there. That attorney appealed the initial decision authorizing a provisional arrest warrant for Lebiedziński by the District Court of Kraków-Śródmieście. The Circuit Court of Krakow rejected that appeal, and in so doing, concluded that "taking into consideration the circumstances under which the crime charged against Krzysztof Lebiedziński was committed…imposing a long term of imprisonment in this case is realistic." [ECF No. 56-1] at 32.

prosecuted, upon a motion of transfer by the Attorney General, in the appropriate district court of the United States for criminal prosecution, whereby that individual could be subject to the full sentencing range available to an adult offender.[2] That is enough to satisfy the requirements of § 3184 and the Extradition Treaty. The Court need not inquire whether that would have been the path this case would have traveled if it was charged here when Lebiedziński was a juvenile. *See, e.g, Hu Yau-Leung v. Soscia,* 649 F.2d 914, 919–20 (2d Cir. 1981) ("[W]e do not believe that the framers of the British Extradition Treaty intended that minitrials would be held to determine whether individuals might in some way receive more lenient treatment under the criminal law. The Treaty, like most other treaties, explicitly limits the type of hearing in the requested country to determine extraditability. Such hearings have been held to have limited scope, both as to the type of defenses which may be raised and the type of evidence which may be received. It would be contrary to this policy against protracted extraditability hearings to allow extradition courts to consider how other courts might exercise their discretion in determining whether an individual such as Hu should be treated as within a juvenile justice system.").

The same result obtains under Illinois law, regardless of whether the individual is prosecuted in juvenile or adult court. When the murder at issue in this case occurred in July of 2000, a fifteen-year-old charged with first degree murder in the state of Illinois would have been automatically transferred to adult court, prosecuted under the criminal laws of Illinois, and subject to the full panoply of

---

[2] Except the death penalty, as provided by *Roper v. Simmons*, 543 U.S. 551 (2005).

sentences provided for adult offenders. 705 ILCS 405/5-130. The sentence for murder in adult court includes a term of imprisonment greater than one year, and in fact proscribes a mandatory minimum of twenty years. 730 ILCS 5/5-4.5-20.

In 2016, sweeping amendments to the Juvenile Court Act raised the age of automatic transfer for first degree murder from fifteen to sixteen years old, and those amendments applied retroactively. *People ex rel. Alvarez v. Howard*, 72 N.E.3d 346 (Ill. 2016). This means that a murder prosecution initiated today against a fifteen-year-old in the state of Illinois would originate in juvenile court, although prosecutors could move to discretionarily transfer the case to adult court under 705 ILCS 405/5-805 and subject that individual to the adult penalties described above. 730 ILCS 5/5-4.5-20.

Even if the prosecution were to proceed entirely under the Juvenile Court Act, a fifteen-year-old who is adjudicated delinquent in juvenile court for first-degree murder would still be subject to a deprivation of liberty for a maximum period of more than one year. *See* 705 ILCS 405/5-750 ("When a minor of the age of at least 13 years is adjudged delinquent for the offense of first degree murder, the court shall declare the minor a ward of the court and order the minor committed to the Department of Juvenile Justice until the minor's 21st birthday, without the possibility of aftercare release, furlough, or non-emergency authorized absence for a period of 5 years from the date the minor was committed to the Department of Juvenile Justice, except that the time that a minor spent in custody for the instant offense before being committed to the Department of Juvenile Justice shall be considered as time credited towards

9

that 5 year period."). In short, under Illinois law, a fifteen-year-old charged and convicted of murder could be punished by a term of imprisonment of more than a year, which satisfies the requirements of the Extradition Treaty.[3]

## III.   Probable Cause

At the heart of this case, then, is whether Poland has submitted evidence "sufficient to sustain the charge under provisions of [the Extradition Treaty]." 18 U.S.C. § 3184. Article 9(3)(c) of the Extradition Treaty requires that Poland provide enough evidence to justify committing Lebiedziński for trial had the offense been

---

[3] In the Court's view, the dual criminality requirement that underlies much of extradition law is an exercise in statutory construction and interpretation. It is not a fact-specific inquiry in each case. That is, the question is simply whether the crime for which the individual is sought is punishable by the "deprivation of liberty for a maximum period of more than one year or by a more severe penalty" in both the requesting and requested countries, not whether, accounting for the nuanced facts of this cold case, Lebiedziński would be prosecuted under Illinois state law for this particular murder and sentenced to a period of imprisonment of more than one year. This approach is consistent with the policy underlying the dual criminality requirement, which is intended only to ensure that extradition may be had for offenses that are criminal in both countries, and only for serious crimes. *See generally, DeSilva v. DiLeonardi,* 125 F.3d 1110, 1113 (7th Cir. 1997) ("If there is probable cause to believe that [the defendants] committed a crime in Canada, and there is probable cause to believe that the conduct would have been criminal if committed in the United States, then extradition is appropriate. This is the 'dual criminality' requirement.... If the acts of the accused are considered criminal in both nations, extradition follows even if the requesting country does not have a criminal statute analogous to the one that makes the acts criminal in the United States."). The extradition framework is, in this respect, predominantly concerned with the gravity of the crime itself and not the treatment of the particular offender.

That said, even under a fact-specific approach, there clearly is an avenue by which Lebiedziński, now thirty-five years old, could be charged under Illinois state law for a murder allegedly committed when he was fifteen. The Illinois Supreme Court has held that there are some circumstances where charges may still be brought against an adult, in adult court, for crimes committed as a juvenile. *People v. Fiveash*, 39 N.E.3d 924 (Ill. 2015). It is not necessary for the Court to delve into the intersection of the Illinois Juvenile Court Act and Illinois Criminal Code given the Court's limited role here. At the level of inquiry appropriate at this extradition proceeding, it is enough that the law clearly allows for a term of imprisonment of more than a year for the crime of murder in Poland, the United States, and the state of Illinois. And Lebiedziński does not challenge that conclusion.

committed in the United States or Illinois, [ECF No. 1] at 25, leaving this Court to apply a familiar probable cause standard. *Noeller*, 922 F.3d at 803; *see also, Emami v. U.S. Dist. Ct. for N. Dist. of California,* 834 F.2d 1444, 1452 (9th Cir. 1987) ("the relevant determination is confined to whether a prima facie case of guilt exists that is sufficient to make it proper to hold the extraditee for trial."). The assessment is similar to that of a preliminary hearing in a criminal case in this country and requires this Court to "apply a totality of the circumstances analysis and make a practical, common sense decision whether, given all the circumstances, there is a fair probability that the defendant committed the crime." *Ortiz,* 444 F. Supp. 2d at 884 (internal quotations and citations omitted). Extradition decisions offer no opinion on the guilt or innocence of the individual whose extradition is sought and do not decide the "punishability" of the accused, only his or her "prosecutability." *Skaftouros v. United States*, 667 F.3d 144, 155 (2d Cir. 2011); *see also, Jhirad v. Ferrandina,* 536 F.2d 478, 482 (2d Cir. 1976) ("Extradition hearings "embody no judgment on the guilt or innocence of the accused but serve only to insure that his culpability will be determined in another and, in this instance, a foreign forum.").

An individual facing extradition should "not be tried in the United States for crimes he is alleged to have committed in the requesting country," nor does the extradition framework contemplate "the right of the accused to have a plenary hearing and trial in the United States" or the right to "compel the demanding government to produce all of its evidence on American soil, subjecting them not only to the difficulties of an unfamiliar system but also the demands of transporting

11

physical evidence and witnesses." *Jarosz,* 800 F. Supp. 2d at 940 (citing *Collins v. Loisel,* 259 U.S. 309, 316 (1922)). An extradition hearing is not a criminal proceeding; neither the Federal Rules of Evidence nor the Federal Rules of Criminal Procedure apply. *In re Mazur,* 2007 WL 2122401, at *19 (N.D. Ill. 2007) (citing *Eain*, 641 F.2d at 508). Generally, "[a]n accused in an extradition hearing has no right to contradict the demanding country's proof or to pose questions of credibility as in an ordinary trial"; "[t]o do otherwise would convert the extradition into a full-scale trial, which it is not to be." *Eain*, 641 F.2d at 511. But the accused may present evidence that "obliterates" the probable cause finding. *Mazur,* 2007 WL 2122401, at *19. Ultimately, "the relevant determination is confined to whether a prima facie case of guilt exists that is sufficient to make it proper to hold the extraditee for trial." *Emami*, 834 F.2d at 1452.

Poland's theory of the alleged crime can be summarized as follows. Around 4 a.m. on July 16, 2000, neighbors noticed smoke coming from the victim Barbara Lebiedzińska's home and climbed in through a second-story window to investigate. The victim's body was in the vestibule, and a fire, the Polish authorities theorized, had been shoddily set by the killer in an attempt to destroy the evidence assuredly contained in the home. There were signs of a violent struggle and blood permeated the scene. The victim's autopsy showed extensive bruising and bleeding to the victim's face, neck, chest, ribs, inner thighs, and back, from which forensic experts concluded that the victim had been repeatedly kicked, beaten with fists, and struck with a blunt object resembling the edge of a hammer or the back of an axe before ultimately being

strangled to death. A murder weapon was never conclusively recovered or established, but a pair of men's underwear, of which the victim's family disclaimed ownership, was recovered near the scene of a struggle in the victim's living room. Although the Polish authorities preserved witness statements and forensic evidence at the time of murder, the investigation lay dormant for almost two decades until a newly surfaced third-party account of a confession and advances in DNA evidence suggested to the Polish authorities that Lebiedziński, who was the victim's nephew, may have been involved in the crime. The National Prosecutor's Office in Cracow contacted the United States Government about extraditing Lebiedziński in 2019, and this extradition case formally commenced in December of 2020 asking that Lebiedziński be returned to stand trial in Poland.

Poland's evidence in support of probable cause is best divided into four categories: (1) forensic evidence, including DNA findings, (2) Lebiedziński's proximity to, and opportunity to commit, the crime, (3) his "confession," and (4) his "flight" to the United States. Although the Government all but abandoned the latter two categories of evidence during oral argument, those underlying facts remain part of Poland's extradition request and therefore merit consideration as part of the totality of the circumstances in this case. The Court takes each category in turn.

### a. The DNA and Other Forensic Evidence

#### i. DNA Findings

The crime scene in this case was brutal and bloody. As a result, Polish investigators were able to obtain and preserve two key pieces of forensic evidence that

together form the most critical pillar supporting probable cause in this case. First, a pair of men's boxer briefs ("the boxers") were recovered next to a radiator in the living room. The victim's only male household members – her husband and two sons – were living in the United States at that time, and they did not recognize the boxers. Furniture in the area where the boxers were found was in disarray, and investigators also found torn jewelry and blood splatter near the radiator that suggested the struggle between the victim and the killer was not confined to the hallway where she ultimately died. Because of the sheer number of violent blows to the victim, as well as the fact that the victim's bra was torn and she had fingertip-shaped bruises on her inner thighs consistent with her legs being forced apart, investigators posited that the killer attempted to sexually assault her and removed his boxers to do so. A struggle then ensued, eventually resulting in the victim's death. No semen was found on the boxers, the victim, or at the crime scene, but there were visible blood stains on the front left side of the boxers.

The second key piece of evidence investigators preserved was the nightgown the victim was wearing at the time of the murder ("the nightgown"). Blood stains were visible on the nightgown when it was processed in 2000, but because the investigation was suspended for lack of evidence shortly thereafter, the nightgown apparently was returned to the victim's family along with her personal effects. In 2019, however, the victim's family was asked to return the nightgown to the

authorities for additional testing. Its exact chain of custody during the intervening period is unknown.[4]

In 2018, advances in DNA evidence – namely, the burgeoning ability of Y-STR analysis to isolate Y chromosomes in biological samples and detect the presence of minuscule amounts of male DNA – prompted the Polish authorities to reexamine the forensic evidence in this case. The Laboratory of Forensic Biology and Genetics at the Department of Forensic Medicine of the University of Medicine in Gdańsk took swabs from the boxers found at the scene and from the victim's nightgown, of which three traces – 1.1, 1.32, and 1.19 – stand out. [ECF No. 1] at 128–29.

Trace 1.1 originated from a blood stain on the front left side of the boxers and was first tested on October 3, 2018. [ECF No. 1] at 128. At that time, the forensic experts detected the presence of human blood and determined that the DNA profile contained therein belonged to an individual identified only as "Female A." [ECF No. 1] at 128. A few months later, on February 21, 2019, those same experts compared blood collected during the victim's autopsy on July 17, 2000 to trace 1.1 and concluded that the DNA profile of the victim was "fully consistent" with the DNA profiled previously identified only as "Female A." [ECF No. 1] at 130. In short, the victim's blood was found on the outside of the boxers.

Trace 1.32 was taken from the inner crotch area of the boxers found on the victim's living room floor and provides perhaps the most compelling evidence in

---

[4] The documents proffered by the defense in support of this chain-of-custody issue do not precisely establish when the nightgown may have been returned to the family during the course of the investigation.

support of probable cause in this case. On February 21, 2019, forensic experts tested trace 1.32 and found a mixed profile of at least two individuals, in which the profile of an unknown male dominated. [ECF No. 1] at 130. That unknown male was designated "Male A." Lebiedziński's mother, father,[5] and two brothers provided consensual DNA samples for comparison, and on February 28, 2020, forensic experts concluded that there was a very high probability (99.9999999%) that Lebiedziński's mother and father were the biological parents of Male A, but that Male A was not either of Lebiedziński's brothers. [ECF No. 1] at 130. On December 8, 2020, Lebiedziński agreed to provide a consensual DNA sample to the FBI, which was, in turn, provided to the Polish authorities. Within a day of receiving the sample, on December 16, 2020, forensic experts in Poland had determined that Lebiedziński's DNA profile was "fully consistent" with the DNA profile of Male A. [ECF No. 33-1] at 19. As for trace 1.32, the same experts opined that there was a "high probability bordering on certainty" that the dominant profile in that trace belonged to Lebiedziński. [ECF No. 33-1] at 19. That evidence was described as "extremely strong," as the value of "LR," or the likelihood ratio, was $5.02 \times 10^{26}$. [ECF No. 33-1] at 19–20, 23. Put simply, Polish forensic experts concluded that it is over five septillion[6]

---

[5] In addition to a consensual DNA sample, Lebiedziński's father also sat for a voluntary polygraph examination. On more than one occasion, the Polish authorities reference that polygraph, and in particular, that Lebiedziński's father "has shown strong reactions during his polygraph examination, indicating that he categorizes his son Krzysztof Lebiedziński as the killer of Barbara Lebiedzińska." [ECF No. 1] at 215; *Id.* at 183, 200. Because the Court has no information about the reliability or accuracy of the administration of that polygraph, these findings have no bearing on the Court's conclusion that there is probable cause to believe Lebiedziński committed the murder of which he is accused.

[6] A septillion ($10^{24}$) is the closest denomination to the likelihood ratio for trace 1.32 ($10^{26}$).

times more likely that the DNA found inside the boxers was Lebiedziński's than that of another person in the Polish population.

Finally, forensic experts honed in on trace 1.19, which was taken from a blood stain on the victim's nightgown.[7] On March 24, 2020, forensic experts confirmed the presence of human blood in trace 1.19 and further determined that DNA isolated from that bloody trace showed the presence of a mixed profile, most likely of two individuals, one of whom was male. [ECF No. 1] at 129. Experts then compared that sample to the DNA features possessed by the victim and "Male A," as that profile was identified at that time. Those experts concluded that it was $1.26 \times 10^{19}$ times more likely that the mixture contains DNA of the victim and Male A than if the mixture included the victim and an unknown individual. [ECF No. 1] at 129. When the experts received Lebiedziński's consensual buccal swab in late 2020, they reached the same conclusion with respect to Lebiedziński's DNA. That is, they concluded it was over a million times more likely that the blood stain contained a DNA mixture of the victim and Lebiedziński than of the victim and some other person. [ECF No. 33-1] at 23.

So, the above findings tell us that Lebiedziński's DNA was found inside boxers recovered from the floor of the victim's living room and on the nightgown the victim was wearing when she died. The victim's blood was on the outside of those same

---

[7] The extradition packet and DNA reports sometimes refer to the article of clothing from which trace 1.19 was taken as a "nightgown" or a "shirt." [ECF No. 1] at 129 ("in the tested stain on the nightgown worn by Barbara Lebiedzinska on the day of the murder, July 16, 2000, in the trace marked 1.19 presence of human blood was found."); [ECF No. 33-1] at 23 ("the trace taken from the shirt Ad. 1.19). Regardless, the Court understands trace 1.19 to have been taken from the outer article of clothing the victim was wearing when she died and will refer to it as "the nightgown."

17

boxers, and it was also on the nightgown, mixed with Lebiedziński's DNA. It is, in the Court's assessment, reasonable to infer from the above DNA findings that Lebiedziński wore those boxers at some point in time, leaving a clear trace of his DNA in an intimate area of that article of clothing. The presence of those boxers at the crime scene also reinforces other circumstantial evidence that an attempted sexual assault occurred the night of the victim's murder; namely, the fingertip-shaped bruises on the insides of the victim's thighs, her torn bra, and scattered jewelry with traces of blood and hair near the radiator in the living room, where a pool of blood was observed and where the boxers also were found.

Lebiedziński charges that "Poland's allegation that the perpetrator would leave his underpants behind[] defies logic," but in the context of an attempted sexual assault, it clearly is conceivable that the perpetrator would remove his underwear to effectuate that crime. [ECF No. 49] at 30. Identifying who may have been wearing underwear discarded at the scene of an attempted sexual assault and violent murder, then, is probative of who may have committed the crime, particularly given that the victim's blood also was found on those boxers. "Probable cause will be found where there is evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the guilt of the accused," and the culmination of the DNA evidence above provides strong circumstantial evidence in support of that same belief here. *Ortiz,* 444 F. Supp. 2d at 884.

That Lebiedziński's DNA was also found on the victim's nightgown, in a mixed profile with her blood, only furthers the Court's conclusion that there is "reasonable

ground to believe the accused guilty" of murder in this case, i.e., probable cause.[8]
*Noeller*, 922 F.3d at 803. Less plausible, alternative explanations for the above-
described DNA findings may exist,[9] but a finding of probable cause "does not require
evidence sufficient to support a conviction, nor even evidence demonstrating that it
is more likely than not that the suspect committed a crime." *United States v. Carrillo*,
269 F.3d 761, 766 (7th Cir. 2001) (internal quotation omitted); *see also, Gerstein v.*
*Pugh*, 420 U.S. 103, 121 (1975) (stating that the probable-cause determination "does
not require the fine resolution of conflicting evidence that a reasonable-doubt or even
a preponderance standard demands"). It is therefore this Court's assessment, based
on the totality of the DNA evidence and the timeline discussed *infra*, that there is
probable cause to believe Lebiedziński is guilty of the victim's murder.

No believable, alternative explanation has been put forth for why boxers
containing Lebiedziński's DNA were found in the victim's home, with her blood on
them, on the night she was murdered. In that respect, Lebiedziński has done little to

---

[8] Lebiedziński argues that the presence of his DNA on the boxers and the nightgown is not
proof positive that he was present at the victim's home when she was murdered. That
certainly is true – the DNA findings provide circumstantial, not direct, evidence of who may
have been present at the scene of the crime. Whether the inferences to be drawn from that
circumstantial evidence are enough to ultimately convict Lebiedziński of the murder of which
he is now only accused is a question for the trier of fact in Poland. Here, where the standard
is probable cause in the context of an extradition proceeding, the circumstantial evidence
presented is more than adequate.

[9] "In dealing with probable cause…as the very name implies, we deal with probabilities.
These are not technical; they are the factual and practical considerations of everyday life on
which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States,*
338 U.S. 160, 175 (1949). While it is it common for courts to consider possible innocent
alternatives that might explain the facts of any given case, the mere existence of innocent
explanations does not necessarily negate probable cause. *United States v. Malin,* 908 F.2d
163, 166 (7th Cir. 1990); *see also, United States v. Fama,* 758 F.2d 834, 838 (2d Cir. 1985).

explain away, let alone obliterate, the reasonable inferences to be taken from the DNA evidence in this case and the probable cause they help establish.[10] At the extradition hearing, Lebiedziński generally posited that the boxers may have ended up in the victim's home because he lived across the street and played with the victim's sons. But the victim's sons, together with the rest of the victim's family, moved to the United States in August of 1998, a full two years before the murder in this case. [ECF No. 1] at 119. One of the victim's sons, Wojciech Lebiedziński, specifically noted that "Krzysztof Lebiedziński has not visited the house at Pilsudskiego 42 in Suraz" since the mid-90s "because their families were at odds." [ECF No. 1] at 134. Lebiedziński's own parents agreed that the families had been "at odds" for about 20 years, and as a result, neither Lebiedziński's father nor mother had been in the victim's home from the moment she returned to Poland from the United States in April of 2000 until the day of her murder. [ECF No. 1] at 131–32. Lebiedziński's brother Zbigniew similarly explained that while he may have been in the victim's house "many years earlier in childhood…because she had children who were peers," he had no reason to visit the house any longer after those children moved to the United States. [ECF No. 1] at 133–

---

[10] Lebiedziński strenuously asserts that "it is not the job of Mr. Lebiedziński to explain the multiple innocent explanations of how men's underwear could have gotten inside the victim's home, [as] the Government seems to think it is." [ECF No. 49] at 39. That is true to a certain extent: it is Poland's burden to put forth competent legal evidence to support the finding of probable cause as to the crime of murder against Lebiedziński. Poland has done so by pointing to strong circumstantial evidence that Lebiedziński was present at the scene of the crime, both through the DNA evidence summarized above and the timeline of his whereabouts during the murder discussed below in this Memorandum Opinion and Order. The extradition framework then provides a narrow avenue for Lebiedziński not to contradict Poland's proof, but to instead present evidence that "obliterates" the existence of probable cause. *Venckiene v. United States*, 328 F. Supp. 3d 845, 868 (N.D. Ill. 2018). Lebiedziński has not done so here.

34. In sum, Lebiedziński's explanation for why boxers with his DNA would be in the victim's home two years after the victim's sons left the country in 1998, and in close enough proximity to the victim's murder so as to be hit with traceable blood splatter, is an improbable theory that is not supported by the record evidence.[11]

To be sure, Lebiedziński has raised legitimate questions about the chain of custody of the nightgown and the probative value of any DNA found on that article of clothing. But for two reasons, this argument has no traction in this extradition proceeding. First, it is well-established that decisions about the adequacy of a chain of custody rest squarely with the discretion of the trial court. *United States v. Lott,* 854 F.2d 244, 250 (7th Cir. 1988). This Court is not the trier of fact, and so the questions Lebiedziński raises about the provenance of trace 1.19 must ultimately be answered in Poland. Second, a challenge to chain of custody ordinarily goes to the weight rather than the admissibility of the evidence. *In re U.S.,* 614 F.3d 661, 664 (7th Cir. 2010); *Melendez-Diaz v. Massachusetts,* 557 U.S. 305, 311 n.1 (2009) (quoting *Lott*, 854 F.2d at 250). This is especially true when the Court is asked only to make a preliminary determination concerning probable cause in a proceeding as limited in scope as extradition. *See generally, Fernandez*, 268 U.S. at 312 (the Supreme Court

---

[11] Similarly, Lebiedziński's laundry swap or clothesline theory (discussed *infra*), i.e., that the boxers could have been hanging on a clothesline to dry at Lebiedziński's home and somehow became mixed up with the victim's laundry when she brought it inside her home across the street, does not undercut, let alone obliterate, Poland's probable cause showing. The boxers in question were found on the living room floor, in the home of a murder victim whom Poland proffers was the target of a sexual assault, not in a laundry basket or with a pile of other clean laundry. As with much of what Lebiedziński has argued in this extradition proceeding, this may be a theory to pursue at trial, but it is not a basis for the Court to reject Poland's extradition request here.

has expressly found that "[c]ompetent evidence to establish reasonable grounds [to extradite] is not necessarily evidence competent to convict.").

Although the Court focused on the three DNA traces (1.1, 1.32, 1.19) with the highest evidentiary value, these were not the only traces forensic experts analyzed in this case. Dozens of traces from the articles of clothing recovered at the crime scene (the victim's nightgown, bra, undershirt, and the boxers) were tested and compared to available DNA samples. Those traces, however, remain unidentified or are not suitable for comparison. For example, a mixed DNA profile was found on the waistband of the boxers, labeled trace 1.3, and numerous mixed or incomplete profiles were obtained from the victim's bra and shirt.

Lebiedziński encourages the Court to conclude that the mere presence of unidentified DNA profiles on various articles of clothing obliterates probable cause. In particular, Lebiedziński points to a mixed profile on the waistband of the boxers (trace 1.3) and says the possibility that there is unidentified DNA in that trace detracts from the probative value of Lebiedziński's DNA having been found, to the high degree of certainty expressed above, on traces 1.32 and 1.19. This point is unavailing. First, the comparative locations of the traces taken from the boxers (trace 1.3 and 1.32) affect their respective evidentiary value. Trace 1.32 was taken from the inside front crotch area, while trace 1.3 came from the back waistband. The intimate location from which trace 1.32 was taken is, in the Court's view, strong circumstantial evidence of who may have been wearing the boxers. By contrast, the mixed profile of three individuals found on the waistband of the boxers is less connected to who may

have been involved in the crime in this case, as a mixed profile in that location could easily have resulted from a family member handling the boxers at some other time. For example, Lebiedziński's brother said his family sometimes hung their laundry out to dry. [ECF No. 1] at 133 ("[Adam] did not notice anyone using such briefs at home, and he also did not see such briefs in other gardens, when laundry was hung dried outdoors somewhere."). For that reason, the mere existence of an unidentified or mixed DNA profile in trace 1.3[12] does not erase the inculpatory inferences the Court has drawn from the presence of Lebiedziński's DNA in trace 1.32.

Finally, although it has been afforded less weight than the traces in which Lebiedziński's DNA was identified with a "high probability bordering on certainty," [ECF No. 33-1] at 19, the number of traces from which Lebiedziński's DNA could not be excluded also bolsters the Court's probable cause finding in this extradition case. For example, with respect to the boxers, the Polish prosecutor explained that "[b]ased on the analysis of the DNA profiles obtained for the traces on the underpants not containing blood, the presence of DNA of male A, i.e. Krzysztof Lebiedziński, cannot be excluded in 17 traces, of Adam Lebiedziński in 2 traces. The presence of Marian and Zbigniew Lebiedzinski's DNA cannot be assumed in any of these traces. Thus, based on the number of traces in which the presence of DNA of the compared persons cannot be excluded, it can be assumed that these underpants were last worn by male A, i.e. Krzysztof Lebiedziński." [ECF No. 33-1] at 63. Nor could Lebiedziński's DNA

---

[12] As best as forensic experts could determine, trace 1.3 contained "a mixture of DNA of several persons…including at least three males, in which presence of DNA of Female A cannot be ruled out." [ECF No. 1] at 129.

(or the DNA of any men who share his Y-chromosome, as explained in the forensic report) be excluded from dozens of traces recovered from the victim's nightgown, shirt, and bra. [ECF No. 331-1] at 23-25.

Lebiedziński is correct that the presence of his DNA on the boxers does not directly prove, beyond a reasonable doubt, that he was in the victim's house the night she was murdered and that he committed the crime in question. The ultimate determination of Lebiedziński's guilt or innocence, however, is not the issue before the Court: it is whether probable cause supports the charge for which extradition has been sought. For all the reasons discussed above, the evidence proffered by Poland at this stage of the proceedings with respect to the DNA found on the boxers and otherwise at the crime scene is, in the Court's view, strong evidence in support of probable cause to extradite Lebiedziński for the murder of which he is accused.

## ii.    Fingerprints and Other Physical Evidence

Lebiedzinski's final attempt to cast doubt on the forensic components underlying probable cause involves the lack of fingerprint and or other physical evidence tying Lebiedziński to the murder. When the crime scene was processed, the Polish authorities did not find Lebiedziński's fingerprints at the home, nor did they recover any hair strands suggesting he was present. In Lebiedziński's view, this dearth of incriminating non-DNA evidence irreparably damages Poland's showing of probable cause, particular given that the victim's autopsy described the presence of fingerprints and partial palm prints in a brownish substance (presumably, dried

blood) on the victim's body and the presence of fingerprints on a panel in the corridor near the stairs. [ECF No. 1] at 124.

As for the fingerprints and palm prints observed on the victim's left hip during her autopsy, Lebiedziński argues that because those prints "did not match" his, there is significant doubt as to who committed the crime in question. [ECF No. 49] at 17, 40 ("fingerprints found on the victim's body…do not belong to Mr. Lebiedziński but rather the perpetrator."). To say those prints did not match Lebiedziński's, however, misconstrues the available evidence. There is, in fact, no information suggesting those prints were in any way suitable for forensic comparison, or that they were ever compared to Lebiedziński's fingerprint exemplar. And even if they had been suitable for comparison, their probative value is suspect, as at least two witnesses admitted touching or moving the victim's body when it was discovered.

One such witness was Stanislaw Topczewski, an emergency doctor who arrived on scene shortly after the victim's body was discovered. He explained that he turned the victim over onto her back and touched her multiple wounds with his hands so as to ascertain their severity. [ECF No. 73-1] at 8 ("The woman showed no sign of life, therefore, as gently as possible, I turned her around onto her back and then I noticed her was all covered in blood [sic] and where the head was lying there was a huge stain of blood. Then I touched this woman's head with my fingers from the top to the bottom sensing under my fingers the presence of several contused wounds…Due to the lack of a pulse, I moved this woman's gown to the top to uncover her chest and be able to perform heart massage…Then I touched with my hands I touched her chest and this

25

examination allowed me to find numerous fractures of ribs on both sides of her chest, the most obvious and evidence on her left side."). So, even if the blood-stained fingerprints on the victim's body had been suitable for comparison and did not belong to Lebiedziński, the witness statements are replete with explanations for why fingerprints of an individual unconnected to the crime may have resulted on the victim's body.

Fingerprints also were observed on paneling in the corridor by the stairs to the second floor. Unlike the prints on the victim's body, however, the evidence admitted at the extradition hearing[13] shows that a dactyloscopy expert was able to compare these prints to those obtained from several individuals and conclude that the prints did not belong to Lebiedziński or any other person to whom they were compared. [ECF No. 1] at 199 ("it appeared that the trace did not originate from Krzysztof Lebiedzinski, nor from any person whose comparative material was sent for testing."); *see also, Id.* at 183. That a partial handprint from a heavily trafficked area of the victim's home did not match Lebiedziński's exemplar does not exculpate him.

### b. Opportunity to Commit the Crime and Lebiedziński's "Alibi"

The DNA evidence described above provides much of the support for the Court's finding that there is probable cause to extradite Lebiedziński. Because of the particular circumstances of this cold case, however, it also is important to piece together a timeline of Lebiedziński's whereabouts on the night of the murder to

---

[13] Lebiedziński relies on Exhibit L to support his argument about the fingerprints recovered on the hallway paneling, but the Court declined to allow Exhibit L into evidence for the reasons explained in its order dated 07/19/2021. [ECF No. 72]. So, in addressing Lebiedziński's argument, the Court has cited to other evidence in the record on this point.

determine whether he in fact had the opportunity to commit this crime. That is particularly true because Lebiedziński argues that the timeline "obliterates" Poland's proffer of probable cause here and makes it impossible for him to have committed the murder as the Polish authorities say he did. Forming a cohesive timeline of a crime that occurred twenty years ago is challenging and imprecise, particularly given how witness testimony and memory can change over time. Even so, it is the Court's view that Poland has shown there is probable cause to believe Lebiedziński is guilty of the crime for which extradition is sought, including by establishing a window of opportunity during which he could have committed it.

The parties in this case strongly disagree about the inferences to be drawn from the below timeline, but most of the actual evidence about Lebiedziński's whereabouts before and after the murder is undisputed. On July 15, 2000, the victim was socializing at a neighbor's house and returned to her home at Pilsudskiego 42 around 9 p.m. [ECF No. 1] at 120. By midnight, a passing neighbor confirmed there were no lights on in the victim's home, and so she was likely asleep. *Id.* Also around midnight, Lebiedziński's sister Anna Lebiedziński ("Anna") confirmed that she and her fiancé were asleep in a back bedroom of the Lebiedziński family home at Pilsudskiego 35, which was directly across the street from the victim's residence in their rural town of Suraz. *Id.* at 133. Lebiedziński's mother and father were, on this particular night, staying at the family's poultry farm[14] about a mile outside of town and went to sleep at 11 p.m. and 12:30 a.m., respectively. *Id.* at 131.

---

[14] The record intermittently refers to the poultry farm as the "henfarm," the "goose farm," or simply the "farm." For consistency, the Court will refer to it as the poultry farm.

27

Lebiedziński, by contrast, was awake and at a disco in Pietkowo with friends in the early morning hours of July 16, 2000. After Lebiedziński left the disco, his friend Krzysztof Jankowski ("Jankowski") gave him and others a ride back to Suraz. [ECF No. 49] at Exhibit F. Jankowski remembers coming back from the "party...at about 2:00" and says he "got to Suraz at about 2:20" with Lebiedziński and his friends. *Id.* When he was crossing a bridge into Suraz, Jankowski was briefly pulled over by a police officer who apparently accepted some amount of money in lieu of a ticket and drove off. *Id.* Three of Jankowski's passengers then decided to get out of the car on the bridge in Suraz, and so Jankowski began driving back home to Lapy with Lebiedziński still in the car. *Id.*; [ECF No. 49] at Exhibit I.

As Jankowski was driving along the main road from Suraz towards Lapy, Lebiedziński asked to be let out near his family's poultry farm. *Id.* Lebiedziński did not explain why he wanted to get out near the farm rather than at his house in Suraz, but regardless, Jankowski let him out on the main street near the poultry farm and continued on to Lapy. *Id.* In one of the statements Jankowski provided to Polish authorities, he narrated that when he "was coming back along Suraz towards Lapy, [he] didn't see any cars, nobody was walking there, either. It was about 2:30 or later when [he] was coming back." *Id.*

When Lebiedziński was interviewed in 2001 (at that time only as a potential witness), he agreed that he was at a disco with friends on the night of the murder and got a ride home at some time unknown. [ECF No. 1] at 198. He explained that he was dropped off near his family's poultry farm, and "[f]rom the farm he walked on foot to

28

the house" in Suraz on Pilsudskiego Street. [ECF No. 1] at 198-99. He told law enforcement that this distance was about 1.5-2 kilometers, and that after he walked back to Suraz, his sister Anna let him into the house. *Id.* Anna recalls that she let her brother into the home "at around 3:00, but she did not look at her watch." [ECF No. 1] at 133. A procedural experiment conducted by Polish law enforcement estimated it would take a person about nineteen minutes to walk to the victim's house at Pilsudskiego 42 from the point on the road near the poultry farm where both Jankowski and Lebiedziński agree Lebiedziński was dropped off. [ECF No. 1] at 128.

The victim's time of death was sometime between 2 and 3 a.m. [ECF No. 1] at 197; [ECF No. 49] at Exhibit B. One of the victim's neighbors, Cezary Holowiekno ("Cezary"), woke up around 3:50 a.m., got dressed, and went outside to milk his cows when he saw smoke coming from the victim's window. [ECF No. 49] at Exhibit D. Another neighbor, Henryk Narewski, also woke up to the fire "at around 4:00" and called the fire brigade before helping his son Bogdan Narewski ("Bogdan") use a ladder to climb into the victim's "smoke-filled house" through a "single open second floor window." [ECF No. 1] at 120. Bogdan searched the second floor for the victim, and when he could not find her, he came downstairs and saw a burning carpet and two propane tanks in the kitchen, one of which was connected to the stove with a hose. [ECF No. 1] at 121.

Bogdan tried to trample the carpet but could not extinguish the fire. *Id.* His father then broke a glass pane in the front door to gain entry to the first floor, and together, they discovered the victim's body in the front vestibule, covered in blood. *Id.*

The fire brigade arrived shortly thereafter and extinguished the fire sometime around 4:15 or 4:20 a.m. [ECF No. 1] at 133; Exhibit X [ECF No. 74-1] at 4 ("On 16 July 2000 at 4:15 a.m. on the spot, it was determined that the fire occurred in a detached masonry, two-story, single-family building…At the place of occurrence, the fire-fighting action was undertaken by the Volunteer fire service (OSP) from Suraz, whose members took out from the kitchen, where the abovementioned rug was on fire, one propane – butane gas tank, bearing the marks of charring."); [ECF No. 74-1] at 7 ("At about 4:20 I went nearby the house of Barbara Lebiedzińska...after extinguishing the fire through the radio station, I notified the officer on duty of the emergency unit in Lapy…"). The rate of charring later revealed that the duration of the fire, or the time between when it was set and when it was ultimately extinguished, was about 50 minutes. [ECF No. 49] at Exhibit C.

Based on the above timeline, Lebiedziński had the opportunity to commit the crime in question. To conclude otherwise would be to impose the precision of a Swiss watch on an inherently approximate timeline pieced together by multiple witnesses about a crime that occurred twenty years ago, in the middle of the night, in a rural town. Every single witness admitted that their description of Lebiedziński's whereabouts was approximate. Jankowski left the disco "at *about* 2:00," "got to Suraz at *about* 2:20," dropped Lebiedziński off at the poultry farm, and it was "*about* 2:30 or later when [he] was coming back" to Lapy. [ECF No. 49] at Exhibit F. Polish authorities estimated that the "*approximate* time" needed for a pedestrian to walk from the poultry farm to the victim's house was "*about* 19 minutes." [ECF No. 1] at

128. Anna let Lebiedziński into the Pilsudskiego 35 residence "at *around* 3:00, but she did not look at her watch." [ECF No. 1] at 133. Cezary "set [his] alarm to *around* 3:45 a.m. – 3:50 a.m.," but it was not until after he got up, got dressed, and went outside to take care of the animals that he saw the smoke at the victim's home and, together with Henryk and Bogdan, made entry into the home to try to check on the victim. [ECF No. 49] at Amended Exhibit E.

If the approximations in each witness's account imply or would accommodate a window of even five or ten minutes on either side of the time quoted – for example, if Anna's description of letting Lebiedziński into the Pilsudskiego 35 residence at "about 3:00" means she could have in fact let him in anytime between 2:50 and 3:10 a.m. – the amount of time Lebiedziński could have spent in the victim's house before returning to the Pilsudskiego 35 residence expands or contracts materially. Lebiedziński argues that construing every approximation in his favor leaves absolutely no time for him to have committed a murder as bloody and violent as that of which he is accused, but he wholly disclaims the possibility of the converse inferences that arise from the witness approximations. That is, construing even one or two points on the timeline against Lebiedziński potentially opens up a window of twenty to thirty minutes or more during which he could have committed the crime before entering his home – to say nothing of the value of an "alibi" that places Lebiedziński only steps away from the scene of a murder at the exact time it is alleged to have occurred. To that point, even if Anna let Lebiedziński into the Pilsudskiego 35 residence at precisely 3 a.m., there is absolutely no evidence that Lebiedziński

31

remained in the house from 3 a.m. to 4 a.m., when Anna next heard sirens across the street and looked out her window to see the fire brigade and a commotion outside the victim's house.

In short, concluding that Lebiedziński could not have committed this crime – in other words, that he has "obliterated" Poland's proffer of probable cause – based on a timeline replete with as many approximations as are contained in the above-described witness accounts would be inconsistent with the standard of probable cause the Court must apply in this extradition proceeding. Reasonable doubt is another question, for another time, in another court. It is not only impossible for this Court to assess the credibility of the witnesses that contributed the above timeline based on written summaries of their statements, but to do so also would exceed the limited scope of this proceeding. This Court is simply not in the position to probe, for example, the basis or accuracy of Anna's estimate that Lebiedziński arrived around 3 a.m., considering that she had been abruptly woken up in the middle of the night to unlock the front door for her brother and did not check her watch. Nor is the Court in any position to assess the credibility or accuracy of Jankowski's approximations concerning his travel along the road from Suraz to Lapy in the early morning hours of July 16, 2000, after a night at a disco in Pietkowo. These credibility determinations belong to the trier of fact and are not properly raised or assessed in an extradition hearing. *Eain*, 641 F.2d at 511–12.

Lebiedziński makes much of a comment by a Polish forensic psychologist that "[t]he perpetrator, then, arrived at the house probably at approximately 2:00…[and]

spent about an hour in the victim's house." [ECF No 73-1] at 62. This is the "smoking gun" of Lebiedziński's alibi, as he says there is no room in the admittedly approximate timeline for him to have spent an hour in the victim's home. But this argument places outsized importance on an opinion generated by a psychologist for the exclusive purpose of "prepar[ing] a psychological portrait of the perpetrator and psychological picture of the occurrence." [ECF No 73-1] at 58. The limited scope of the psychologist's undertaking and thesis makes it clear that the psychologist did not intend – nor should the opinions contained in the report be interpreted – as the type of expert scientific or forensic reconstruction of the crime scene that would be necessary to opine with any degree of certainty as to the amount of time necessary to commit the murder in this case.

This is exemplified by the fact that at another point in the very same opinion, the psychologist theorized that the murder could have been accomplished in a quarter of an hour. [ECF No. 73-1] at 62 ("The analysis of the data regarding the place of the occurrence indicates that before Barbara Lebiedzińska died, the perpetrator spent at least a quarter of an hour in her house."). Nor did the psychologist apparently have enough confidence in the aforementioned theories about the time spent by the perpetrator in the victim's house to include those findings in the conclusions that could be stated with "certain probability" at the end of the report. [ECF No. 73-1] at 66-67. The Court will not, as Lebiedziński urges, substitute a psychological analysis of the perpetrator's state of mind for actual physical evidence – or a scientifically sound crime scene reconstruction – from which the Court could extrapolate how long

the perpetrator was in the victim's home. Again, the Court is inclined not to overstep its limited role in this extradition proceeding by hypothesizing about facts in dispute that should be resolved by the trier of fact, such as the amount of time it could have, would have, or did take the perpetrator to commit this crime given the overall forensic evidence and witness testimony in this case. The Court has instead given the forensic psychologist's report the weight it is due based on the stated context in which it was provided and the matters that are within, and not within, the psychologist's area of expertise.

Finally, although Lebiedziński affirmatively stated he does not "challenge the 19-minute estimate" derived from Poland's procedural experiment, [ECF No. 49] at 19 n.12, he continued to advance, both in his brief and at oral argument, various theories of his walk from the poultry farm to Suraz that would have changed that "agreed" estimate. His position on the route he took from the road where Jankowski dropped him off to his home at Pilsudskiego 35 has been a moving target. When Lebiedziński was questioned as a witness in 2001, he told investigators that he returned from Pietkowo in his friend's car and walked from the poultry farm to the house at Pilsudskiego 35. There was no mention of any detour. [ECF No. 1] at 198-99 ("Krzysztof Lebiedziński – interrogated as a witness only on 09 March 2001…On the night of the murder, Krzysztof Lebiedziński was at a disco in Pietkowo, took a bus, returned from Pietkowo by his friend's car – Fiat 126p, does not remember the exact time. From the farm he walked on foot to the house (about 1.5-2 kilometers), he saw

nobody on Pilsudskiego Street near the Lebiedzińska's house, his sister Anna opened the door of the house for him.").

Then, early in this extradition proceeding, Lebiedziński asked to admit into evidence an affidavit in which he stated, under penalty of perjury, that after Jankowski dropped him off at the main road, he walked to the poultry farm, then walked back to the main road, and then on to his family home in Suraz. [ECF No. 49] at Exhibit J. The Court was not inclined to admit this exhibit for the reasons stated in its Order dated 07/19/2021, [ECF No. 72], but at the extradition hearing, Lebiedziński abruptly asked to withdraw Exhibit J because it was not "accurate." Transcript of the 8/16/21 Hearing [ECF No. 82] at 9–11. Instead of the walk from the road, to the farm, and back to the road recounted in the affidavit, Lebiedziński's counsel theorized (apparently based on his out-of-court discussions with Lebiedziński but without any evidence admitted on this point) that after Jankowski dropped Lebiedziński off on the road, Lebiedziński walked to the poultry farm and then on to Pilsudskiego 35 along a gravel road – not the road where Lebiedziński got out of Jankowski's car. Transcript of the 8/16/21 Hearing [ECF No. 82] at 7–8. But because Lebiedziński chose not to testify (after initially indicating that he wanted to do so) and his counsel advanced this theory for the first time at oral argument, there is no direct evidence in the record on this point. Transcript of the 8/16/21 Hearing [ECF No. 82] at 4–5.[15]

---

[15] The route to Lebiedziński's house in Suraz from the poultry farm along the gravel road appears to be a shorter distance than the route along the paved road, but there also is no evidence in the record on that point. Lebiedziński's counsel proffered during oral argument that the Polish authorities believe it would have taken only 18 minutes and 19 seconds to

In lieu of the aforementioned direct evidence, Lebiedziński attempted to use one of Jankowski's several statements to Polish authorities to bolster this third, new theory. In particular, Lebiedziński ascribes the following testimony to Jankowski: "According to Mr. Jankowski he dropped off Mr. Lebiedzinski at the main road and saw him walk towards the Henfarm." [ECF No. 49] at 25 n.12. Yet none of Jankowski's statements place Lebiedziński walking from the road to the poultry farm. Instead, Jankowski speculated that after he dropped Lebiedziński off at the road, Lebiedziński "went towards the henhouse probably." [ECF No. 49] at Exhibit I. But, as Jankowski explicitly stated closer in time to the incident, this was a guess. He did not see where Lebiedziński went after he dropped him off at the road. *Id.* at Exhibit G ("After the police control, Krzysiek Lebiedziński sat in front. I don't remember if Tarasiuk was sitting at the back and if I drove him to Lapy. Lebiedziński told me to stop further near the henhouses. He left at the main street, I didn't drive him to the henhouses. I didn't see where he went next. He had about 500 m from this road [to the poultry farm], and to Suraz about one kilometre or one and a half.").

The shifting sands on the exact route Lebiedziński took from where Jankowski last saw him (at the road near the poultry farm) to where his sister Anna saw him next (at Pilsudskiego 35) do not appreciably alter the apparent consensus between the parties that nineteen minutes is a reasonable approximation of the time it would have taken Lebiedziński to walk from the location where Jankowski dropped him off

---

walk to Lebiedziński's home in Suraz along the gravel road based on another procedural experiment they had done. Transcript of the 8/16/21 Hearing [ECF No. 82] at 9. But again, there is no evidence in the record on this point aside from the argument of counsel. *See generally* Transcript of the 8/16/21 Hearing [ECF No. 82] at 7–14.

on the road to the residences on Pilsudskiego Street. Lebiedziński, the Government, and the Polish authorities all agreed to this approximation, and so the Court too relies on this estimate in its own analysis. As with all else in the reconstruction of Lebiedziński's alibi, this too is an approximation. And adding a detour to the poultry farm and moving the window of time it would have taken Lebiedziński to walk to the town of Suraz would not change the Court's conclusion that there is probable cause to believe Lebiedziński committed the crime in question.

### c. The Confession

Over a decade after the case went cold, information about an individual who had allegedly confessed to the murder found its way to the victim's son Wojciech Lebiedziński ("Wojciech"). Almost like a game of telephone, authorities traced the origin of the confession through multiple layers of hearsay as follows. Piotr Sianko ("Sianko"), who also was from Suraz, told Wojciech that his cousin, Dawid Karczewski ("Karczewski"), overheard a fellow classmate at the Technical Secondary School in Lapy boasting about killing his aunt in Suraz. Sianko believed it was Lebiedziński who made that claim, but he never talked to Lebiedziński about this subject because Lebiedziński "was too crazy, he called him 'madman,' nobody wanted to associate with him then." [ECF No. 1] at 199.

So, authorities tracked Karczewski down in December of 2019 to discuss the confession he allegedly overheard and conveyed to Sianko. [ECF No. 1] at 135. Karczewski recounted that sometime in 2002 or 2003, he was sitting in his friend Jaroslaw Szymborski's ("Szymborski") car with a man from Suraz who started

bragging, "as if he wanted to show off," that he had killed his aunt or grandmother in Suraz. [ECF No. 1] at 216. That man from Suraz detailed that he had pushed his aunt or grandmother and saw that she wasn't moving, so he covered her with a rug and ran away. *Id.* Karczewski did not know the man from Suraz, nor did he recognize an image of Lebiedziński that the authorities put on a "picture board." *Id.* But he knew the man was Szymborski's friend from school and described him as a "peer, a little taller than him." *Id.* A few weeks after the conversation, Karczewski found out from Szymborski that the man from Suraz who confessed to the murder in Szymborski's car stopped attending school and left the country. *Id.* The authorities asked Szymborski about the alleged confession, but he claimed not to have any memory of it. *Id.* at 217.

Using school records provided by the Headmaster of the Technical Secondary School in Lapy, Polish investigators were able to cross-reference students who would have attended class with Symborski around the time of the confession. *Id.* at 136, 217. According to the records, Lebiedziński and Symborski were classmates in September of 2002, which was also around the time Lebiedziński abruptly left Poland for the United States, as discussed below. *Id.*

There are obvious deficiencies in the above "confession" that diminish its probative value. Karczewski could not identify Lebiedziński as the source of the confession, either by photograph or by name. Nor could Szymborski, who was alleged to have been Lebiedziński's friend at the time, fill in those gaps, as he claimed to have no memory of the supposed murder confession in his car. But there also are

characteristics of the confession that might be considered in a probable cause analysis. A classmate of Symborski's confessed to killing his aunt (or another female family member) in the same small town and under similar circumstances as the murder of which Lebiedziński, who was Symborski's classmate at the time, is now accused. One specific fact in particular – that the individual covered his aunt's body with a rug – raises an eyebrow, as a rug with traces of the victim's blood was found burning near the victim's body in this case. Lebiedziński was in school with Szymborski at the exact time Karczewski overhead the confession, and Karczewski also described the person who confessed to the murder as a peer. In 2002, Szymborski and Lebiedziński would both have been about seventeen years old. [ECF No. 1] at 199 ("Piotr Sianko…was 16 years old on the day of the murder."). The individual who allegedly confessed to killing his family member also apparently stopped attending school and left the country shortly after bragging about having committed this crime. On September 4, 2002, Lebiedziński stopped coming to school, and on September 12, 2002, he boarded a flight to the United States, returning only once in the intervening eighteen years.

Considering the totality of the circumstances so as to "make a practical, common sense decision whether, given all the circumstances…there is a fair probability" that Lebiedziński committed the murder of which he is accused, the above-described confession carries some, though not very much, weight. *Ortiz,* 444 F. Supp. 2d at 884 (internal quotations and citations omitted). A person of ordinary prudence and caution might be hard-pressed to ignore the coincidence that

Lebiedziński, whose DNA was found in two places at the crime scene, also happened to be enrolled at a school in another town at the exact time a student there allegedly confessed to killing a female family member in Suraz in a strikingly similar way to the murder of which Lebiedziński is now accused, and that both Lebiedziński and the student who confessed to murder abruptly quit school and left the country shortly thereafter. *See generally, Matter of Guillen,* 1991 WL 149623, at *8 (N.D. Ill. 1991) ("The question [of probable cause] is whether there is, evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt.").

In the final analysis, however, the ultimate test of the veracity and reliability of the supposed confession depends upon the credibility of the witnesses to it. That kind of an inquiry is beyond the scope of the Court's probable cause analysis in this extradition case. Therefore, although the Court has considered the alleged confession, it accords that confession little weight in its ultimate finding that Poland has proffered competent evidence in support of probable cause to believe Lebiedziński committed the crime with which he is charged. In other words, without the much stronger DNA and timeline evidence, the confession does not tip the scale toward probable cause in this case.

### d. Flight from Poland to the United States

As discussed above, the Polish government offered evidence of what it considers Lebiedziński's suspicious departure from Poland during the course of the investigation. A few months after the murder, in September of 2000, Lebiedziński

began attending the Technical High School in the Mechanical Schools Complex in Lapy. [ECF No. 1] at 136. He attended grade I classes for that term from September 1, 2000 until June 30, 2001. *Id.* After a summer break, he then enrolled in grades II and III of the Vocational School in the Mechanical Schools Complex in Lapy and completed another term from September 1, 2001 to June 30, 2002. In September of 2002, he returned to school for grade III and attended the first few days of classes until law enforcement fingerprinted him as part of the ongoing murder investigation. He abruptly stopped attending classes on September 4, 2002 and left the country for the United States on September 12, 2002. *Id.* at 137. In the eighteen years since, he has only returned to Poland once. [ECF No. 1] at 215.

The Court views the specter of Lebiedziński's "flight" from prosecution in a similar vein as the above-described confession – it factors into the Court's assessment of the totality of the circumstances underlying probable cause, but it has limited probative value by itself. Lebiedziński has put forth an alternative explanation for his departure from the country in September of 2002: that he had, for several years prior, been the victim of sexual abuse by a priest. [ECF No. 49] at 45; [ECF No. 20] at 23–24. Similar to the inferences to be drawn from the supposed confession, the Court does not consider any inference that can be drawn from Lebiedziński's flight from Poland to be outcome determinative on the issue of probable cause. Without the much stronger DNA and timeline evidence, Lebiedziński's flight from Poland does not tip the scale toward probable cause in this case.

## IV.     Other Matters

There are a few ancillary issues that need to be addressed. First, at various times during this case, Lebiedziński has advanced different forms of the argument that extradition should be denied because shortcomings in the Polish judicial system or with the Polish prosecutor may prevent him from receiving a fair trial if he returns to Poland. *See, e.g.,* [ECF No. 27] at 1 n.2; [ECF No. 49] at 46 ("It is a bizarre irony that, on evidence that could not support a domestic arrest or search warrant, this Court is nevertheless being asked to allow a United States resident to be wrongfully shipped to a foreign country that has already demonstrated its willingness to distort the truth in order to convict, at any cost."). Because these arguments relate to issues of fairness in a foreign justice system and not the requirements for certification, Lebiedziński must direct these concerns to the Secretary of State. *In re Extradition of Noeller,* 2017 WL 6462358, at *2 (N.D. Ill. 2017).

There also has been some implication, both during oral argument and in Lebiedziński's written filings, that extradition would be inappropriate here because Poland only moved to extradite Lebiedziński some twenty years after the crime in question. Any delay between the date of the crime and Poland's extradition request is amply justified by the trajectory of the evidence in this case. It was not until 2018 that the Polish government was able, as a result of advances in DNA technology, to begin focusing on Lebiedziński as a suspect, and additional evidence continued to be uncovered and confirmed in 2019 and 2020. The Court therefore sees no unfairness,

due process or otherwise, in Poland's request to extradite Lebiedziński for a crime that occurred two decades ago under the particular facts of this case.

Finally, Lebiedziński at one time advanced the argument that the provisional arrest warrant issued by Poland was invalid and therefore, the extradition proceedings must be deemed null and void. He has since abandoned that argument, perhaps because it is without merit. Setting aside whether a procedurally deficient provisional arrest warrant in Poland would have affected the course of these extradition proceedings in the United States, the Circuit Court of Krakow upheld the issuance of the provisional arrest warrant and rejected Lebiedziński's appeal related to corollary extradition proceedings in Poland. [ECF No. 56-1] at 26–33.

## V.    Conclusion

Based on all of the evidence presented by the Republic of Poland and supplemented by Lebiedziński himself and considering the evidence and arguments that Lebiedziński has put forth in opposition to Poland's extradition request, the Court finds that there is competent legal evidence to support the finding of probable cause as to the crime of murder against Lebiedziński. Pursuant to 18 U.S.C § 3184 and the Extradition Treaty between the United States and the Republic of Poland, the Court certifies Lebiedziński's extradition. The United States is directed to submit a proposed Certification of Extradition and Order of Commitment to the Court. It is further ordered that a certified copy of this Memorandum Opinion and Order and of the Certification of Extradition, together with all formal extradition documents received into evidence, a certified copy of all testimony and evidence taken at the

43

hearings, and a copy of all memoranda of law filed on the issue of extradition, and all other orders of the court, shall be forwarded to the Secretary of State by the Clerk of the United States District Court for the Northern District of Illinois. Finally, Krzysztof Lebiedziński shall remain in the custody of the United States Marshal pending final disposition of this matter by the Secretary of State.

It is so ordered.

Jeffrey T. Gilbert
United States Magistrate Judge

Dated: November 10, 2021