IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KRYZSTOF LEBIEDZIŃKI, ) | |
| ) | No. 20-cr-842 |
| Petitioner, ) | |
| ) | Judge Jorge L. Alonso |
| v. ) | |
| ) | |
| UNITED STATES OF AMERICA AND ) | |
| RUSSEL HEISNER, ) | |
| WARDEN, METROPOLITAN ) | |
| CORRECTION CENTER, ) | |
| ) | |
| Respondents. ) | |

## Memorandum Opinion and Order

Before the Court is Kryzstof Lebiedzińki's petition for writ of habeas corpus brought under 28 U.S.C. § 2241. Following a hearing, the Magistrate Judge in this case issued an order concluding that probable cause existed to sustain the charge for which Poland seeks extradition and certified Lebiedzińki's extradition to Poland to stand trial. In his petition, Lebiedzińki challenges the Magistrate Judge's order and whether there is sufficient evidence of probable cause to support his extradition. Because the Court answers that question in the affirmative, Lebiedzińki's petition [89] is denied.

## Background

The events underlying this petition occurred over 22 years ago in Suraz, Poland. On July 16, 2000, Barbara Lebiedzińska, the Petitioner's aunt, was brutally beaten and murdered in her home. At around 4:00 a.m. on July 16, 2000, neighbors discovered smoke emanating from a window in the victim's house and called the fire department. The victim was discovered deceased with a bloodied head. A forensic opinion revealed that her death was caused by

asphyxiation due to strangulation. At the time, she was wearing a nightgown, t-shirt, watch, and bra, which had been torn. She also had bruises on her thighs and investigators concluded that the perpetrator attempted to rape her. Investigators recovered a man's underwear from the scene, which contained visible blood stains on the front left side of the underwear. According to witnesses, the underwear did not belong to the victim's husband or sons. The investigation further revealed that the perpetrator entered the home without resistance, suggesting they knew the victim, and attacked her in multiple places inside the home before killing her.

A neighbor who entered the home before investigators observed a burning carpet in the kitchen and two propane-butane gas cylinders, one of which was connected to the stove by a hose. Investigators discovered the gas cylinders and burnt carpet which, along with the kitchen's walls and ceiling, were blackened as a result of the fire. They concluded that the perpetrator attempted to cause an explosion to cover up the homicide before escaping through a second-floor window. They further estimated that the perpetrator started the fire approximately fifty minutes before neighbors observed smoke coming from the victim's home. Eventually, the authorities suspended the investigation for a lack of evidence and returned the victim's personal effects to her family, including the nightgown she was wearing at the time of her murder.

In 2018, advancements in DNA analysis allowed the Laboratory of Forensic Biology and Genetics at the Department of Forensic Medicine of the University of Medicine in Gdańsk, Poland to test the underwear and victim's nightgown[1] for DNA. From these items, Polish authorities discovered several DNA traces from the underwear and nightgown. Pertinent to this case are three of those traces.

---

[1] In 2019, the family returned the nightgown to the authorities for additional testing. But the chain of custody between the time it was given to the family and then returned to authorities is unknown.

2

The first trace originated from a blood stain on the underwear and forensic experts determined that the DNA profile belonged to a "Female A." Those same experts later concluded that Female A's DNA was fully consistent with the victim's DNA profile. The second trace originated from the underwear's inner crotch area. Forensic experts determined that this trace contained a mixed profile of at least two individuals, one of whom was an unknown male that dominated. This male was designated as "Male A." The third trace originated from a blood stain on the nightgown. Forensic experts determined that this trace showed a mixed profile that, most likely, contained one individual who was male. The experts further concluded that it was 1.26x1019 times more likely that this mixture contained DNA of the victim and Male A than if the mixture included the victim and an unknown individual.

In 2020, the lab obtained consensual DNA samples from Lebiedzińki's family, which allowed it to conclude with 99.9% probability that Male A was a son of Lebiedzińki's parents but was neither of his two brothers. After being arrested, Lebiedzińki provided a DNA sample. The Polish lab tested this sample and concluded that Lebiedzińki's DNA matched the DNA of Male A recovered from the underwear and nightgown.

At the time of the victim's murder, Lebiedzińki was fifteen years old. According to witnesses, Petitioner's family and his aunt had been estranged for many years and Petitioner had not been inside his aunt's home since the mid-1990s. On the night leading up to his aunt's murder, Lebiedzińki was at a disco in Pietkowo. An individual drove him from the disco and dropped him off near his parent's poultry farm in Suraz between 1:00 and 2:30 a.m. on July 16, 2000. The driver stated during an interview that he dropped Lebiedzińki off near his parent's poultry farm, that they returned from the disco at approximately 2:00 a.m., and that they arrived at Suraz at roughly 2:20 a.m. where they were pulled over by a police officer while crossing a

3

bridge. The poultry farm was located about 0.93 miles from Suraz. Investigators estimate that it takes about 19 minutes to walk from the poultry farm to the victim's home. At approximately 3:00 a.m., Lebiedzińki's sister let him into her home, which was across the street from the victim's home.

## Discussion

Orders certifying extradition are not appealable as of right under 28 U.S.C § 1291, but parties seeking review may file a petition for a writ of habeas corpus in district court. *See Burgos Noeller v. Wojdylo*, 922 F.3d 797, 803 (7th Cir. 2019) ("Courts have long recognized an alternative path for appellate review, through a petition for a writ of habeas corpus under 28 U.S.C. § 2241."). The Court's role in the extradition process is limited and habeas corpus review of extradition certification is no different. *See id.* at 802-803 ("[T]he judicial role is narrow ... The discretion in the process belongs to the executive branch, not the judiciary.").

A deferential standard of review follows from the Court's limited role. District and appellate courts review factual findings by a magistrate judge for clear error and legal rulings de novo. *Id.* at 804. This standard ensures that habeas corpus review does not become a re-litigation of the extradition hearing. *See Eain v. Wilkes*, 641 F.2d 504, 508 (7th Cir. 1981) ("The district judge is not to retry the magistrate's case."). District court review is not only deferential, but also limited in scope. *See Burgos Noeller*, 922 F.3d at 803. In *Fernandez v. Phillips*, the Supreme Court first outlined this limited scope of review, stating that "habeas corpus is available only to inquire whether the magistrate had jurisdiction, whether the offense charged is within the treaty and, by a somewhat liberal extension, whether there is any evidence warranting the finding that there was reasonable ground to believe the accused guilty." 268 U.S. 311, 312 (1925).

*Fernandez*'s "reasonable ground" language is equivalent to the more common "probable cause" standard used in federal preliminary hearings. *Burgos Noeller*, 922 F.3d at 803.

The scope of review in extradition cases expanded after *Fernandez* to match the general expansion of habeas corpus review. Previously confined to jurisdictional questions, habeas corpus review now allows consideration of potential constitutional violations. *See Matter of Burt*, 737 F.2d 1477, 1484 (7th Cir. 1984) ("Only subsequent to *Fernandez* did the Supreme Court substantially redefine the scope of habeas corpus review, which previously had been tied to an examination of jurisdictional defects, to include an evaluation of whether the petitioner is being held in violation of any of his or her constitutional rights."). Thus, in addition to those challenges outlined in *Fernandez*, courts reviewing habeas petitions in extradition proceedings have "the authority to consider not only procedural defects in the extradition procedures that are of constitutional dimension, but also the substantive conduct of the United States in undertaking its decision to extradite if such conduct violates constitutional rights." *Id.*

In sum, four categories of argument are available today to petitioners seeking review of extradition proceedings. The three inquiries articulated in *Fernandez* remain open: whether the magistrate had jurisdiction, whether the offense charged is within the treaty, and whether there is any evidence warranting the finding of probable cause that the petitioner is guilty of the offenses charged. Petitioners may also bring challenges alleging constitutional violations.

In his petition, Lebiedziński challenges only whether there was evidence supporting a finding of probable cause. Reviewing courts do not independently determine whether a finding of probable cause is merited, instead they ask "whether there [was] any competent evidence to support [the] finding" made by the magistrate judge. *Bovio v. United States*, 989 F.2d 255, 258 (7th Cir. 1993); *see also Burgos Noeller*, 922 F.3d at 807.

Lebiedzińki argues that probable cause was lacking because the Magistrate Judge: (1) mischaracterized and contradicted Poland's evidence with respect to the timeline of events, (2) relied on DNA evidence that was so deficient that it should not have been considered, and (3) considered arguments that were flawed and abandoned by the government. The Court addresses these arguments in turn.

I.  **Timeline of Events**

Lebiedzińki begins by arguing that Poland's timeline evidence obliterated any potential for probable cause because the alleged facts did not leave him with sufficient time to commit the crime. The Magistrate Judge, on the other hand, found that Lebiedzińki had the opportunity to commit the crime in question based on its analysis of the timeline of events. Normally, the accused cannot offer alibi evidence in an extradition proceeding because an alibi contradicts, rather than explains, the evidence. *See Burgos Noeller*, 922 F.3d at 807. Explanatory evidence is such that it explains away or completely obliterates probable cause. *Id.* (citing *Santos v. Thomas*, 830 F.3d 987, 992 (9th Cir. 2016), quoting *Mainero v. Gregg*, 164 F.3d 1199, 1207 n.7 (9th Cir. 1999), superseded by statute on other grounds).

Lebiedzińki primarily relies on a report issued by a Polish forensic pathologist to support his argument that it was impossible for him to commit the alleged crime. According to Lebiedzińki, the timeline of events went as follows: he was dropped off near his family's hen farm at 2:30 a.m.; it then would have taken him at least 19-minutes to walk from the farm to his aunt's home[2]; he arrived near his aunt's home at 2:49 a.m. at the earliest; and the perpetrator

---

[2] Lebiedzińki claims in his brief that he was not dropped off directly at his family's hen farm, but that he was dropped off on the road at which point he walked to the hen farm and then back to the road—all of which were not accounted for in the estimated 19-minute walk. The Magistrate Judge properly disregarded this argument because there was no direct evidence in the record to support these facts. Lebiedzińki chose not to testify during the extradition hearing and his counsel raised this argument for the

6

started the fire in the home about fifty minutes before 4:00 a.m. when neighbors discovered smoke coming from inside the house (i.e., around 3:10 a.m.). But according to the pathologist's report, the perpetrator spent about an hour inside the home. Thus, according to Lebiedzińki, the Magistrate Judge's conclusion that he had an opportunity to commit the crime is incorrect and contradicted by evidence from Polish authorities.

This argument is flawed for several reasons. First, the report he relies on was a pathologist report created to prepare "a psychological portrait of the perpetrator and psychological picture of the occurrence." Poland Extradition Exhibit 12, ECF No. 73-1, at 58. It was not, as the Magistrate Court correctly noted, intended to be a scientific or forensic report reconstructing the crime scene or a timeline of events. As such, any suggestion that the one-hour period described within the report is a precise measurement is incorrect. Lebiedzińki places disproportionate weight on the report's recitation of facts and corresponding timeline.

Second, many of the times given by witnesses were approximations. Indeed, as the Magistrate Court pointed out, every witness acknowledged that their descriptions of the times were estimates. *See, e.g.*, Witness Interview Report for Krzysztof Janikowski, ECF No. 49-6 (Jankowski left the disco "at about 2:00," "got to Suraz at about 2:20," dropped Lebiedzińki off at the poultry farm, and it was "about 2:30 or later when [he] was coming back" to Lapy); Complaint, ECF No. 1, at 128 (Polish authorities estimated that the "approximate time" needed for a pedestrian to walk from the poultry farm to the victim's house was "about 19 minutes."); Complaint, ECF No. 1, at 133 (Sister let Lebiedzińki into the Pilsudskiego 35 residence "at around 3:00, but she did not look at her watch."); Witness Testimony Report for Cezary

---

first time during oral argument. *See* Mem. Op. and Order, ECF No. 87 (Nov. 10, 2021). Accordingly, the Court need not consider this argument either. Moreover, even if this evidence were properly before the Court, it does not explain Poland's evidence—rather, it attempts to contradict Poland's evidence and therefore is a matter of credibility for the trier of fact to decide.

Holowienko, ECF No. 49-5 (Neighbor woke up at 3:50 a.m. but it was not until after he got up and went outside to take care of the animals that he saw the smoke at the victim's home and, together with other neighbors, made entry into the home to try to check on the victim).

But Lebiedzińki insists that these estimates show that he did not have an opportunity to commit the alleged crime. Not so. Lebiedzińki's treatment of the approximated times as a precise timeline of events is neither reasonable nor required under the probable cause standard. *See In re Rodriguez Ortiz*, 444 F. Supp. 2d 876, 884 (N.D. Ill. 2006) ("[C]ourts apply a totality of the circumstances analysis and make a practical, common sense decision whether, given all the circumstances ..., there is a fair probability that the defendant committed the crime."). What's more, arguments related to inconsistent timelines or an arguable lack of sufficient time to commit the crime, such as those made by Lebiedzińki, are matters of credibility for a trier of fact to decide—not this Court or the Magistrate Court. *See Eain*, 641 F.2d at 511.

Third, Lebiedzińki's insinuation that the Magistrate Judge abandoned his neutral role and adopted an adversarial position is entirely baseless. To the contrary, the Magistrate Court maintained its neutral role and methodically reviewed the evidence before it—including the approximate timeline of events—and made reasonable inferences therefrom in conjunction with its probable cause assessment. Nothing in the Magistrate Court's order suggests that it failed to consider or adopt Poland's evidence as presented in the extradition petition. In short, the Magistrate Court reasonably concluded that the evidence failed to obliterate Poland's proffer of probable cause.

**II.    DNA Evidence**

Next, Lebiedzińki takes issue with the Magistrate Court's analysis of the DNA evidence. Again, he challenges whether there was sufficient evidence to support a probable cause finding. And again, his challenge fails.

Lebiedzińki argues that there must be more than DNA evidence to establish probable cause and that it is insufficient that the DNA evidence here suggests that he likely wore the underwear recovered at the crime scene. He further argues that, even if he wore the underwear at some point, recovering it at the crime scene does not show that he committed the alleged crime. But these arguments miss the mark by quite a bit.

The Court must view the evidence as a whole and not as isolated components. *In re Rodriguez Ortiz*, 444 F. Supp. 2d at 884. And when viewed as a whole, the Court has no trouble concluding that the DNA evidence, in addition to the timeline evidence, are sufficient to establish probable cause to believe Lebiedzińki is guilty of the crime for which Poland seeks extradition. The underwear was recovered from the crime scene, Lebiedzińki's DNA was found in the inner crotch area and was determined to be the dominate profile in a mixed profile of at least two individuals, the victim's DNA was found in a blood stain on the underwear, the underwear did not belong to anyone in the victim's family, and Lebiedzińki's DNA was found in blood stain taken from the victim's nightgown that she died in. All of these facts establish competent evidence to support the Magistrate Court's finding.

Lebiedzińki also makes much of the parties' stipulations that: the presence of DNA on the items of clothing found at the crime scene does not definitely prove when the DNA was deposited, that the individual whose DNA was found was the person who directly deposited the biological sample on the clothing, that the individual connected to the DNA was physically

9

present at the crime scene during the commission of the crime, or that the DNA was deposited during the commission of the crime. But the Court fails to see how these stipulations help Lebiedzińki's case because the government need not "definitely prove" anything at this stage. In fact, the Magistrate Court was not required to determine whether the evidence would prove the Lebiedzińki's alleged guilt, but merely whether there was competent evidence that would justify his apprehension and extradition to stand trial in Poland. *See United States v. Nolan*, 561 F. Supp. 2d 784, 794 (N.D. Ill. 2009). And that standard is clearly satisfied here.

Furthermore, Lebiedzińki's suggestion that there must be more than DNA evidence to support a finding of probable cause is both unsupported by authority and not reflective of the commonsense approach to probable cause findings. As a matter of fact, probable cause can exist for extradition purposes in the absence of any physical evidence whatsoever. *See, e.g., Bovio v. United States*, 989 F.2d 255, 259-261 (7th Cir. 1993) (finding a Swedish investigator's affidavit sufficient to establish probable cause, notwithstanding the defendant's argument that there was no physical evidence implicating him in the criminal activity); *Eain*, 641 F.2d at 509-511 (finding the affidavits of an accomplice, corroborated by the affidavits of a police officer and a second civilian witness, sufficient to establish probable cause). Accordingly, Lebiedzińki's contention is entirely without merit.

Equally unpersuasive is his argument that the trace's locations do not establish probable cause. Lebiedzińki argues that DNA traces from several unrelated men were found in the intimate areas of the underwear and, therefore, the Magistrate Court was incorrect in concluding that the DNA evidence provided strong circumstantial support that the wearer of the underwear committed the alleged offense. But again, this kind of credibility argument is for the trier of fact

to evaluate. This Court is not in a position to evaluate the credibility of evidence. *Burgos Noeller*, 922 F.3d at 807.

Finally, Lebiedzińki argues that the Magistrate Court improperly relied on DNA evidence recovered from the victim's nightgown. Lebiedzińki contends that reliance on the nightgown's DNA evidence was inappropriate because Polish authorities did not preserve the victim's nightgown after her murder. Rather, the authorities returned it to the victim's family after the investigation stalled and, as a result, the chain of custody for this piece of evidence does not exist. But as the Magistrate Court correctly noted, this argument goes to the weight of the evidence, not its admissibility, and is within the discretion of the trial court. *See In re U.S.*, 614 F.3d 661, 664 (7th Cir. 2010); *United States v. Lott*, 854 F.2d 244, 250 (7th Cir. 1988). Lebiedzińki's efforts to distinguish the cases cited by the Magistrate Court or cast doubt on its analysis are unpersuasive.

### III. Flight and Confession Evidence

Lebiedzińki also argues that the Magistrate Court erred by relying on evidence that the government all but abandoned. The Court need not linger long here as the evidence discussed in the preceding sections provides sufficient justification for a probable cause finding. In any event, the Court disagrees that the Magistrate Court committed any error with respect to additional evidence offered by Poland.

Lebiedzińki asserts that the Magistrate Court erred by considering an alleged confession made by him to David Karczewski, a cousin to one of the victim's son's childhood friends, and by considering Lebiedzińki's alleged flight from Poland only a few months after the murder. But the Magistrate Court acknowledged the obvious deficiencies with the alleged confession—such as the fact that Karczewski couldn't identify Lebiedzińki by photograph or name, or the fact that

another individual who supposedly heard the confession could not corroborate it. The Magistrate Court, therefore, afforded the confession little probative value. *See* Mem. Op. and Order at 39-40, ECF No. 87 (Nov. 10, 2021).

Likewise, the Magistrate Court afforded Lebiedzińki's alleged flight limited probative value in light of his explanation that he left Poland because he had been the victim of sexual abuse for several years. *Id.* at 40-42. In fact, the Magistrate Court stated that without the much stronger DNA and timeline evidence, the flight evidence would not be enough to satisfy the probable cause standard. *Id.* at 41. The Magistrate Court's opinion also makes clear that it only considered these categories of evidence because they were included in Poland's extradition request and, as such, were still fair game for consideration as part of the totality of the circumstances despite being all but abandoned. The Court sees no error in that analysis and Lebiedzińki presents no authority that the Magistrate Court could not consider this additional evidence included in Poland's extradition request.

Besides, Lebiedzińki has not shown that the absence of this evidence would have changed the result—the Magistrate Court acknowledged that the DNA and timeline evidence carried the day with respect to its probable cause finding. In short, the Magistrate Court relied on sufficient competent evidence to support its probable cause finding.

## Conclusion

For the reasons stated above, Lebiedzińki's petition for writ of habeas corpus [89] is denied. Civil case terminated.

**SO ORDERED.**  ENTERED: April 28, 2023

_____
**HON. JORGE ALONSO**
**United States District Judge**